We're starting with the Pickle case. I hope I'm pronouncing that correctly and counsel as they say come on down. Good morning your honors. May it please the court my name is Dennis Boyle and I represent the appellants Mark and Melissa Pickle. I would like to request to reserve three minutes for rebuttal. Absolutely go ahead sir. Okay your honor we would say I would suggest that the central issue in this case is whether the Pickles the grandparents of the two children at issue stood in a local parentis with respect to the two children. That's great so but of course to be a good judge you have to be flexible so I'm going to throw you a I'm just going to move ahead just for a moment. Okay. And I want you to articulate because ultimately this is going to be about liability right so if you establish in loco parentis if you're able to articulate a liberty interest then the question is going to ultimately rest with municipal liability or liability for the individuals yeah? Correct your honor. Okay so let's talk about municipal liability for a second. There are different iterations of potential liability. You do articulate an alternative theory of customer usage at one point in the complaint. Tell me what your focus theory on municipal liability in this case in our opinion is based upon the practices of the agency as articulated by the director of the agency who was designated by the defendants to testify as to the policy practices and procedures of the agency. That individual Crystal Natan basically reviewed this case indicated that everything that occurred here was consistent with the policies of the people in loco parentis or grandparents in loco parentis. It has no policy or it delegates responsibility for for identifying and contacting people to the caseworker involved and we believe that that is insufficient in a case like this. Well what's your best single authority for the proposition that grandparents have substantive and procedural due process rights with respect to the visitation of the grandchildren? I think that this case of city Eric Moore versus the city of East Cleveland establishes the due process rights of custodial grandparents with respect to their children. We would suggest that there's a number of other cases concerning in loco parentis that have occurred since then involving unwed parents. Those aren't grandparents. Correct. Correct. Grandparents we think the courts establish have a special role independent of whether they're in loco parentis or not. We would indicate our position is that it's the concept of in loco parentis that establishes the grandparents rights in this particular case. So wouldn't Moore stand only for the proposition that a municipality cannot invalidate the associational rights of grandparents particularly in so far as that case was concerned with the school habitation? I apologize your honor. I believe that Moore establishes substantive due process rights for family relationships in that case specifically the grandmother. When the court dealt with the municipal ordinance the court went to great length to say that family relationships are important, that grandparents are important, and in that particular case that the grandmother had a substantive due process right that had been violated by the municipality. But the process right issue there was one of family occupancy, family cohabitation, which is we don't have that here because the Pickles were not living with their own kids or vice versa. Well, I think that's a little bit of a separate issue. In loco parentis occurs when a person assumes the responsibilities of a parent. In this case... But in loco parentis was not involved in Moore. So how does that help you respond to Jeffrey's question? In loco parentis was not mentioned in Moore, but what was mentioned was a grandparent who was in a relationship where her grandchildren lived with her. That may not have been in loco parentis even though the children lived in there. Nevertheless, the Supreme Court found that there were substantive due process rights. In the case of someone, a grandparent who's in loco parentis, my position is that those rights are even stronger. The Pennsylvania Supreme Court, you know, as recently as 1995, said that people in loco parentis have the same rights and obligations as a parent. Well, let me ask you a question on that particular point. And I'd like you to, if it requires a different answer for SPL as opposed to DL, fine. But in thinking about in loco parentis as it relates to grandparents, tell me the point in time when you think about the fact that the, I have Luray in my head, the pickles, became in loco parentis. Because you're not claiming that just their status as grandparents puts them in loco parentis, correct? Certainly not. Okay, fabulous. So give me the point in time for each. With respect to, and these are two different situations. Yeah, I told you. SPL, I think we need to take a look at the natural parents, first of all, to establish what the pickles were doing. In this case, the natural mother suffered from a condition that rendered her disabled. And essentially ineffective in almost any way to function as a parent. She was married, her and her husband were both drug addicts, and they were, and I think everybody would occur, that neither parent here was capable of ever caring for the children. Therefore, we would suggest that when Sean Paul was first born and they moved in with the pickles, that the pickles assumed the responsibilities of parenthood then. They provided clothing for the children. They provided food for the children. They cared for the, I'm saying children, I mean SPL, and I apologize for that. I don't want to be confusing. They essentially performed the roles of parents, assumed the roles of parents and acted as parents. SPL had a bedroom in the pickles house. I get all that. Okay. Forgive me for interrupting, but I just want to like get to it. Right. We know January 14. They're in there and they're doing their thing for SPL, right? And we know that in March of 15, it appears that that sort of daily or regular care that you're alluding to ended, and then it formally ended when the state stepped in in May of 15, right? So my question is, when it began, you'd say, you know, I presume you'd say, well, let's say January of 14. I would, Your Honor. I'm sorry about that. I didn't mean to be long winded. No, no, no. You know, you're up here. You got the time. But in May of 15, that ends, right? I would suggest that the in loco parentis status did not end just because the child was removed. Fabulous. Now, did it end? Okay. Did it continue into May of 16? We would suggest it continued until it was terminated effectively by the court when Sean Paul was, I'm sorry, I meant SPL, was, you know, when the parental rights were terminated and he was placed in the custody of the adoptive parents. At that point, the in loco parentis status of the grandparents had been ignored, and it had been functionally terminated by the court or by the agency, even though there was no court decision. When did it officially begin? I mean, the fact that the Loraos are living with the Pickles, and SPL is Lorao's child living with Mr. Michael Pickle. The fact of that cohabitation does not in and of itself give rise to the legal relationship of in loco parentis or does it? And if it doesn't, then when did that begin? Okay. Your Honor, that cohabitation does not create in loco parentis rights. They're created when the grandparents assume the responsibility of the parents. Do they have to somehow convey that relationship? Do they have to somehow convey that responsibility to the local state agency or not? Is the fact of them assuming that responsibility in and of itself sufficient to give rise to the legal definition of loco parentis? I think the Pennsylvania courts have been clear that no court order or court action is required. It's a status that's based upon this gleam from the evidence. As the district court noted in this case, it's intensely fact specific. But what we have to do is look at the facts and what the Pickles were doing, what they were intending to do, the fact that they were the ones who were functioning as the parents. That began, we would suggest, when the Loras moved into them, because we don't think that the Loras themselves were ever able to provide the support that SPL needed. Mr. Boyle, let me ask you this. At best, the way I see the law with respect to grandparents' substantive procedural due process and loco parentis status, it's very unsettled. Would you agree with that? I don't think that the concept of loco parentis is unsettled. No, not the concept. But attributing substantive procedural due process rights to the parents is unsettled. I think that there are different types of grandparents. I think that there are grandparents who are in loco parentis status with the children. And no court has ever recognized their procedural substantive due process rights, correct? Of people in loco parentis, I believe that they have. I believe the Sixth Circuit has. I'm sorry, I don't have the case in front of me. The Pennsylvania Supreme Courts have clearly recognized the rights of people in loco parentis. Well, the Superior Court opinion that you folks briefed for us by way of your 28-J letters made it clear that part-time caregivers don't have this in loco parentis standing, correct? I would agree with that. And at best, they were part-time caregivers in this case. I would disagree with that. I think that there are contested issues of fact here that were not considered by the court. And I don't want to repeat myself, but they were the ones who were providing the care. They were not mere babysitters. The relationship was not merely a biological relationship. They were supporting the children emotionally, financially, in all ways that a person would. And I see that I'm out of time. I thought your answer to the judge's question would be slightly different. I thought your answer would be, judge, we don't get to the constitutional violation because the error below was with regard to in loco parentis. And that then needs to go back. So in the first instance, the question of a constitutional violation would have to be handled by the district court. I thought that's what you might say. You didn't. Maybe you can tell me, am I thinking about it in an incorrect way? I think that is exactly correct, and I wish I had articulated that. Just adopt it. Yeah, I would adopt that as my argument. Why should we not follow what we did in Reese's unpublished opinion, apply qualified immunity to these facts? Because in this case, I think that the rights of people in loco parentis is well established. I think that there are contested issues of fact that need to be resolved. I think if the grandparents are in loco parentis, they have the same rights as the parents. The rights of the parents are clearly established. And the agency is aware of this. I don't think this is a qualified immunity case. Well, you'd have to agree that it could be thought to be a qualified immunity case as to the individuals. Right? Because, I mean, when you say that you think it's clearly established, help us on the notion of clearly established. I think the Supreme Court has established the due process rights of some grandparents. I think the rights of parents and the right of family integrity are clearly established constitutional rights. I thought your focus was on liberty and liberty interest. And I think that is and I think they are established as liberty interests as well. And that's more you're relying upon for that. That's correct, Your Honor. Let me just I know your time is up. May I ask this? Let's assume we were to remand this because it does seem to me there's some factual issues here that are disputed in the material. What would that look like? It goes back. There are some factual issues that are resolved. Certain things are clear. It is clear that the relationship of in loco parentis between the Pickles and SDL and, I guess, the DL was never, well, it's Frick and Gallop, but that's, you know, that was never really formally reduced to any kind of a legal document, a court decree, a court proceeding did not result in any such adjudication. So it does seem to me that the individual defendants here were less than cavalier in the way they regarded the Pickles, almost seemed to be a kind of contempt for the Pickles. And it suggests that they went into this, they, the individual defendants, went into this whole inquiry, social service inquiry with the mind that these people are just not fit and we got to make sure that they don't get SPLs custody in later deals. There are just many, many errors in the documents that they relied upon to reach their conclusion that Pickles weren't fit. But then what do we do with all that, especially with the horror of qualified immunity looming large, as far as the individuals are concerned? Pretty much putting ourselves in the individual's position, and I was relating this the other day, when I was a state court judge, we would rotate duty, 24-hour duty, and I'd get these calls at 3 and 4 o'clock in the morning from a welfare agency asking for a temporary restraining order to remove the usually almost always infant from the parents' house, sometimes the grandparents' house. There'd then be, for the next 10 minutes, a string of horrors, a parade of horribles would be run by me in terms of what's happening with this kid. Clearly, the child welfare worker was concerned, if I leave this kid, I being the child welfare worker, if, judge, if you leave this kid in this household until we can get into court in the morning and get a formal hearing, this kid's going to be dead or permanently damaged. You've got to act now. And invariably, I would grant the temporary restraining order, and then the next morning, usually I'd go into court and there'd be a formal presentation and I'd sign the formal order. And I assume something very much akin to that is what's on the mind of the individual defendants here, and they've got to be concerned, like, if we don't act now, this kid may be dead or permanently disfigured or damaged. And that's why it seems to me qualified immunity, which is a doctrine of the law, which is not on my list of favorites, may well be particularly pertinent here, even if we were to send it back and these factual issues are resolved. And what's wrong with that? I threw a lot at you. I'm sorry, Mr. Boyle. Your Honor, quite honestly, I understand the doctrine of qualified immunity, and I think that is an issue in this case. I don't think the facts in this case, I think the facts in this case are disputed as to what the social workers knew, what they didn't know. Our position, I think, is viewed in the light most favorable to the non-moving party, us. The evidence establishes that the Pickles had no problems or no issues. The child would not have been placed in danger if he were with the Pickles. The Pickles had other minor children that were with them. Nobody ever took custody of those children or alleged any kind of abuse of those children. And I think it's fair to say, viewing the light most favorable to the non-moving party, that the agency never would have let the Pickles have custody under any circumstance. I tend to agree with that. They had already decided what was going to happen to these children and really didn't care what the family had to say at all. However, I would concede that there are disputed issues of fact, and ultimately it should be for a jury to decide which facts are true and which facts are not true. What's the most important dispute, the most important genuine dispute where you would say in response to Judge McKee's question, Judge, let's just focus on this one genuine dispute, whether you think it's dispositive in and of itself, but the one that you think is most important for us to understand, to really grasp your argument. I think that what's most important from my standpoint, and I'm speaking personally, is really the right of somebody who's in loco parentis and whether that right terminates when the person no longer is physically present. If you step into the role of being in loco parentis and for some reason that custody or that arrangement is interfered with, does the right to in loco parentis terminate? And we would suggest that it does not. In loco parentis, you step into the role of a parent. You are, for all functional purposes, the parent. Parental relationships do not end so easily as the county would suggest in this case. But you agreed earlier that the in loco parentis status may be terminated. So it could be for a period of time. It doesn't exist in perpetuity. Certainly, I mean, yes, people in loco parentis have the same rights as parents. Parental rights can be terminated as well. How old are the children and how long have they been in foster care? The oldest children was born in 2013, December of 2013. That's SPL? Pardon? We're talking about SPL right now? SPL. DL was born in May of 2017. SPL has been in foster care since May of 2015. DL has been in foster care since his birth. So what was SPL's birthday? SPL's birthday was 12-27-2013. You talked about a, with regard to SPL, when you think the in loco parentis status began? Yes. And I presume with regard to DL, you'd say it's when the agreement, one of the agreements. When the guardianship agreement was executed. And when did the in loco parentis status end for the Pickles as to DL? Your Honor, I will concede that the circumstances surrounding DL are much weaker because DL never lived with the Pickles. They never had the opportunities to provide support for him as they had wanted to. So it's under all of the factors, it's a much more difficult case to say that he was in loco parentis. I mean, I think we would say that SPL clearly was. DL was his brother. I think that that relationship is important. We would also indicate that it was the mother's desire, the natural mother's desire, to have the Pickles take custody of DL. And there was no reason why they shouldn't have. So at the end of the day, if we send this back and the judge is charging the jury, would the judge include some instructions to the jury about what's in the best interest of the child? I think what's in the best interest of the child is a decision for the court of common pleas. I think that the issues in this case are whether the constitutional rights were violated. The jury doesn't get to decide where the children should live. That decision is over. It would be in essence remanded to the court of common pleas to make that ultimate decision. Pardon? It would in essence be remanded to the court of common pleas to make the ultimate decision. And to be quite clear, we're not seeking that. I mean, these children. What are you seeking? We're seeking damages for the violation of the due process right. Okay, great. So tell me now, since you've articulated that, your damages with regard to SPL? Yes. Accrued in March of 2015 and for purposes of calculation done in May of 2015? Or are you saying that the in loco parentis status extended beyond May of 2015? If so, when do you think they ended? We believe that they ended when the child was adopted. So that's in 2017? Correct, Your Honor. So that's a constitutional violation, right? March of 15 to I forget what month in 17. I'm getting a little fuzzy, but I agree with that, Your Honor. And for SPL? For SPL? I'm sorry. That was SPL, sorry. For DL? For DL, we would suggest that the constitutional violations began at the child's birth and ended when that child was adopted out, which I think was roughly a year later. This would be difficult damages to quantify. They're very difficult damages to qualify. This is not a case that anybody's trying to try to make money with or anything like this. This is something that- Well, there's a fee shifting piece here, too, right? Pardon? There's an attorney's fees piece here, too. There's an attorney's fees piece. There's declaratory relief as possible, and there's certainly nominal damages, and a jury can attempt to quantify what the damages would be from the loss of an opportunity to raise your grandchild. It seems to me what you really have to hear is to try to get the state, not suggesting that you would win or that they need to shape up, but to get the state agencies to use a parochial expression, to shape up and fly right, to stop this kind of wanton kind of, if it can be characterized as that, and it may be unfair for me to characterize it that way, but the kind of cavalier approach to these kinds of families. That's correct, Your Honor. We find the conduct of the agency to be shocking. We believe it is cavalier, and we believe it completely disregards the rights of people who are in local parentis. I mean, at this point in time, these two children are already with other families. They have established relationships, and trying to rip them out of their families now and undo what's been done is not possible, and we would never suggest that. Why wouldn't there be a time bar? I know you're saying continuing violation here, but at least as SPL, why wouldn't the clock for disaster limitations start to run when they learned that the kinship care application had been denied? That was one discrete event. Why wouldn't that start the clock running? Because that's not, that was a different procedure than the local parentis procedure. The kinship care thing is something that should not have happened because they were in local parentis. So, you know, they were part of the system. They were doing what they were supposed to do. They were providing information to the agency. They were talking to the agency throughout the whole time, and the final loss of SPL did not occur until the adoption. If we disagree with you, you've articulated with regard to municipal liability that it was a policymaker. Now, I thought the district court disagreed with that position because you hadn't articulated a particular policymaker, and I haven't heard one now. Why is it that we should reverse the district court's view on that if you haven't sort of responded to that deficiency? We don't believe that a policymaker needs to be identified in the case where there is an unconstitutional policy that's admitted by the agency. If we disagree with you on your policy notion, are there any other theories of liability that, with regard to municipal liability, that, in your view, could fill in? Not that I would articulate at this point in time. I think if the court disagreed with me, I would have nothing further to state on that issue. Judge McKee, do you have anything further, sir? No, not very difficult and troubling case, no matter how it comes out. It's just a real tragedy, this case, and I have nothing further. All right. Thank you. Thank you, sir, and thank you. We'll hear from you on rebuttal, sir. Okay. Thank you. We can do that one more time. Good morning, and may it please the Court, Shane Hazelbarth on behalf of the Lancaster County Defendants, and that's everybody on our side of the VA except for Jay Landis and Nicole LaZeus, and with me at counsel's table is Gregory Kunkel, who represents Ms. Landis and Ms. LaZeus. The individuals. Those two individuals. Yes. I know there are more. Yes, that's right. So we're going to split the time 12 minutes and three minutes, and he'll touch on the statute of limitations issue and any loose ends that I leave. You're the clean-up hitter? All right. Go ahead, sir. We believe that the district court's entry of summary judgment was correct in this case. There was no violation of anybody's constitutional rights, as alleged in this case, on the facts that they developed that summary judgment. Now, let me ask you this question. If a grandparent established in loco parentis, we're going to assume that for a second, right? I know that you don't want to inside. You're going, no, no. It's good to be chief. Right? So if a grandparent established in loco parentis status, is the combination of that relationship and the status sufficient to endow them with the liberty interest? Theoretically. Today, the law is unclear. It is not clearly established, so I'm waiting to call for immunity. It is certainly not clearly established, but it is not even established. There's one Sixth Circuit case that we've found, and everybody else has, you know, run for the hills on that issue. The law is clear that if a person, any person, has in loco parentis status, they have a relationship to the child. But by definition, that person is not the parent. And loco parentis is an informal, procedurally informal situation. It's not a formal adoption. If somebody takes on in loco parentis status, they certainly have the right to say, pick up the kid from daycare. Take him to the doctor. Release HIPAA information. All that is true. They are like a parent, but they are not a parent, and the Constitution does not provide a right to that person, as has been recognized by any court today. Let me ask you this follow-up question, then. Let's assume for a moment that we found the pickles to be in loco parentis. Let's just deal with SPL for a moment, okay? They were in loco parentis for a period of time. We could have discussions about what period of time, from January of 14 to sometime in 15. It's unimportant. But for a period of time, we agree they were in loco parentis status. That's obviously not what the district court had found. Are we bound at that point to send it back to the district court? No, Your Honor, because what you'd be looking at is whether the pickles were in loco parentis to the children. And was that true at the time the county became involved with the Loral family? In March of 2015, Mrs. Pickle confronted Jasmine about her heroin abuse, and she took SPL away from her, didn't let her see him, and from that point forward, they were not in a relationship together. In the Rees case, the district judge noted that the child's name was Pearl. She had been removed from the grandmother for one to two months before the Office of Children and Youth became involved, and that amount of time was enough to sever any arguable relationship. On appeal, this court said there's no clearly established violation there for the individuals who have intervened in that situation where there's a one to two month gap from any relationship. Here, it's even more clear, for SPL even. From March forward, he's not in the presence of Mrs. Pickle or Mr. Pickle at all. In May, the county gets involved. A safety plan is put in place. He's then moved to the home of Karen Loral, Sean's mother. That's where the safety plan was violated, and it's from that place that the county removed SPL from that home. Mrs. Pickle is a complete stranger to all of that. So whether there was in loco prentis in 2014, it is 100% established there was not in loco prentis starting from the time that Jasmine said, you cannot see my son anymore, and certainly at the time the county became involved two months after that. Okay, so your point is nothing after March of 2015. So with regard to DO, your argument would be that the agreement should have no effect on an in loco prentis determination? Not that it should have no effect, but the in loco prentis relationship arises when two things happen. When a person assumes a parental status and discharges parental duties. That's from Peters v. Costello, a 2005 Pennsylvania Supreme Court case. It's cited in footnote five of the district court opinion in Rees. Assume a parental status and discharge parental duties. Mr. and Mrs. Pickle did not do either of those to DL. There was a signed agreement that they could take custody of DL. That agreement was signed on the very day that DL was transferred from the hospital in Dauphin County to Lancaster County at the request of Jasmine. That transfer was made at her request and that's admitted in Mrs. Pickle's deposition. Days later, the county petitioned for custody of DL. And you have to remember, the county is working with a woman whose parental rights were involuntary terminated with respect to SPL. They are then notified that she's non-compliant with her prenatal parent. I don't just mean non-compliant, but she's abusing cocaine, which causes a dangerous premature birth for DL. This is the situation in which the county is acting. And so we don't have a situation of Mrs. Pickle and local apprentice to a child who's born of a mother who's involved with the county youth services. The child's in the NICU, transferred, and petitioned for custody right away. There's simply not an assumption of parental status and a discharge of parental duties for either child. Part of what's troubling, a lot of it is troubling. As I said earlier, it's a real tragedy. I think you're absolutely right in terms of how you're reciting this and looking at this through the eyes of the county folks involved when they say, well, the parental rights were already established, already terminated so far as any rights that Pickle had to SPL. But one of the things that's outlined in the opponent's brief is the parade of errors that went into terminating the kinship relationship between SPL and Pickle. And it looks like all of the allegations, I think there are nine or ten of them, none of them were correct. The one that was correct in terms of the minor that was implicated in the reasoning for terminating the kinship relationship, she was almost 18 years old. Yes, she was technically a minor. And the other thing, they were caring for someone who had very profound medical problems which excuses or explains the absences from school. That's what I was referring to when I was talking about what appears to me, and I apologize if it's inaccurate and unfair, and it may be inaccurate and unfair, but it appears to me to be a very cavalier attitude with the way the agency handled the relationship between SPL and the Pickles. And then from that, the dominoes begin to fall because based upon that, when D.R. is born, well, you've already got a finding, a determination that Pickles were unfit because of what happened with SPL, which appears to be explainable and not all that egregious. But then, you know, the dominoes, as I said, begin to fall, and the kind of inevitable march toward today begins. Well, Your Honor, when you're speaking of the list of reasons, I believe you're speaking of the home study that Crystal Weneck conducted. That was conducted in September of 2015 when SPL was already in the formal custody of Lancaster County children and youth and residing with a foster family. The home study was conducted, and Mr. Pickles admitted every single one of those reasons in his deposition. It is true that the brief of the appellant says they are not true, but the plaintiff in this case said that they were true, and Mrs. Pickles admitted one or two of them herself. So I don't need to defend the attitude of my clients, although the emails, while they speak for themselves, these people are professionals. The reasons they acted, which were stated in the denial letter of the kinship resource application, A, they were admitted by the plaintiffs. B, the plaintiffs could have and sort of tried to appeal that and abandoned the appeal. So an unappealed determination is now morphing into a constitutional violation. That's not how this works. When the county workers were acting, when they looked at the home, should we take a child out of a foster home and put him in the Pickles' home? They can consider the grandparent status. They can consider, well, the minor child is almost 18. That's fine. But in everything that they consider, the employment issues, the housing issues, the truancy issues, is that a home where we're going to place a child? And is the failure to do that a violation of due process rights? No case has said that. None actually. That's as fine a retort to a series of questions that I have posed as I ever heard. I understand your position, and you've answered my concern. You've addressed it. Thank you. Let me ask you, what do we make, if anything, of the September 6, 2016 order from the Lancaster Court of Common Pleas that gave the grandparents in loco parentis standing to pursue custody? Sure. If I'm its law clerk, I say, Judge, let's wordsmith it. But what he did was he cited sub 3 of that statute. And so, I mean, the statute says it's for someone without in loco parentis status, a grandparent, but who has these following sort of, you know, connections to the child. But the effect of that order was to give them permission to pursue custody. They got what they wanted. They said, I want to pursue custody of this child. And the judge says, go henceforth and pursue it. They then participated. They filed a custody petition. That was dismissed because there was a pending dependency hearing. He was adjudicated dependent, was his SPO. And then they filed a petition to adopt. Mrs. Pickle cross-examined witnesses for four days in support of her own petition to adopt and in opposition to the resource parents petition. So the effect of that order, you have status to pursue custody, was 100% in favor of Mrs. Pickle, and she exercised those rights. So there was no deprivation of any constitutional right by, you know, the reference to a loco parentis status to pursue custody. So it wasn't conferring on that status. It was just giving them the opportunity to pursue it. Yes. That's your position. Okay. Yes. Let me ask you. That was great. I know that it was an important point. Keep it in mind. Affirm on the Mon-El.  So let's talk about municipal liability for a moment. And I know that in order to talk about it, we have to make assumptions that you're not willing to make. But for the purposes of this question. I'm your guest. Absolutely. I love that song, Be Our Guest, right, when the kids were little. I don't know the song. I won't break into it. Thank you so much. I do have it in mind. Put our service to the test. In any case. So municipal liability. Here's the question I have for you. The district court's discussion of municipal liability really did not address, did not take into account a theory of custom or usage. It is articulated by the plaintiffs, now appellants, in their complaint. Making the assumptions we have to for the purposes of this question. Wouldn't we have to send it back? Because there's been essentially no addressing of that issue of whether or not municipal liability arises from a custom or usage theory. No, you would not need to send it back for several reasons. First, if there's no underlying constitutional violation, there's no municipal liability claim. Oh, you've got to play my game. We have to assume that. But we're talking about writing the opinion now. So you don't have to. I don't think we always have a choice here. All right. Well, okay, you've proven that you've got a backup job if you need one. But let's focus for a second. Make my assumption. So we've found it, right? We have found a local parentis, right? But we haven't gone to the constitutional violation because one way of thinking about it is if we find a local parentis, it should go back for a determination, given that foundation of whether there is a constitutional violation. Or is your position, before we get to municipal liability, that we here at the Court of Appeals would have to address the constitutional issue in the first instance? There's no fact-finding that needs to occur, and the record is the record. Summary judgment was proper. If summary judgment is affirmed for other reasons or reversed for other reasons that are established in the record, you can make that call. There's no further work that needs to be done in the district court. The in loco parentis status, what the case law says you need, what the fact says you have, that's clear. On the municipal liability claim, the district court had a reference to there being new theories pled at the summary judgment stage from what was in the complaint. But he did go through and address all the theories that were raised by the plaintiffs throughout every proceeding. So the district court, in your view, addressed custom usage? The holding of the district judge, of Magistrate Judge Perkin, was that there was no custom that violated the plaintiff's constitutional rights. In other words, it's not enough to have policies. The plaintiff has to show that these policies deprive them of constitutional rights. And so here we... Custom usage is a little different, right? I get it on the policy. I put that aside. Well, the custom you need for a Monell claim is so widespread that it becomes a policy. You can't point to it in a book and say this is the policy, but it's so widespread that the custom is prevailing. And so here we simply don't... On the policymaker, we said they haven't identified a policymaker who articulated the policy. On the customer usage, they haven't articulated any that violated the rights, that deprived them of constitutional rights. Well, here's my understanding of the articulation, and then you can respond to it, okay? So my understanding of the articulation is the allegation was that the agency convenes regular so-called permanency review meetings during which caseworkers briefly present their cases and make a recommendation as to what to do with these children, and the attendees vote whether a child will be removed from his or her home or a kinship care application will be approved or denied. Now, putting aside whatever the merits are, that seems to be their articulation of it. And I'm not clear that the district court addressed it, but you say that the court did. So I know it was a magistrate judge, but let them have their promotion. Well, I mean, the court entered summary judgment on all claims, so it was ruled on, if not addressed explicitly. In the briefs of the parties before this court, it was hashed out by both sides. So it's been argued to you. And the plain exposition is that the custom or usage, because they meet in a committee, ergo constitutional violation, we find that incomprehensible. They meet in a committee, and they took a vote. I don't even conceive of how that could be a constitutional violation. You know, this court sits in panels of three. I say that's bad. Where is the substance to that? When Lancaster County Children and Youth meets to review placement determinations, you know, services that they're going to provide for families, when they're meeting in this group to make sure there are no violations, how does that become a constitutional violation? No case supports that, and the record doesn't support a constitutional deprivation here. So I don't think there's a need for a remand on that point. Okay. Judge McKee, do you have anything further, sir? No, no, I don't. Mr. Hasselblad just blew me away with so – blew me off, I should say, in terms of the concerns, and I don't have any. Thank you, Your Honor. Okay. Okay, well, one of us is leaving happily. Okay. May it please the Court, Your Honors. My name is Gregory Kunkel. I'm here on behalf of the Pelleys, Jade Landis and Nicole Lauzes. And my time is very brief today. I'm here only to speak on behalf of the statute of limitations argument. As to the remainder of our arguments, we rely on our briefs and the argument presented so aptly by co-defendants' counsel with respect to the substance of the constitutional violations. The issue with respect to the statute of limitations in this matter, Your Honor, reduces basically to one issue, whether the continuing violations doctrine as advocated by the plaintiffs is applicable in this matter. And we would submit that the record in this matter makes it clear that this is a quintessential example of an ill-effects argument, which this Honorable Court has said that does not qualify as a continuing violations doctrine. And more specifically, running through logically how it proceeds, the statute of limitations for a 1983 claim is, of course, two years, pursuant to Pennsylvania common law, which is incorporated. The cause of action accrues even though the full extent of the injury has not been known or even predictable. When does this start to run for each of the individual plaintiffs? Well, again... Children, I should say. Yes, and with respect to S.L., which is the only child that Jade Landis and Nicole Lauzers were involved with, the statute of limitations runs when they, we would submit, when the November 5th, 2015 letter is issued over the signature of Jade Landis and Nicole Lauzers. Now, that is a letter that was generated by the county as a consequence of the vote that was taken at the committee, which is based upon the investigation by Crystal Winnick. So my clients, Jade Landis and Nicole Lauzers, were not involved in that investigation. That was another county investigation. They were members of the committee. However, because Jade Landis and Nicole Lauzers, who were working for an agency that was hired by the county, Covey's Family Services, and they were the case managers for S.L., the letter went out over their signature. So that's the determination that's made on November 5th, 2015. The Pickles expressed grievance at that point and initially sought to redress those grievances through an appeal process, which was accorded to them. However, they did not pursue that. So clearly they're cognizant of an injury. An injury has been, as they claim, has been inflicted upon them as a consequence of the denial of their kinship application. And they don't pursue that. The substantive involvement of my two clients ends at that point. And so this case is not brought until August of 2018. And again, using the criteria that this court has articulated in the Cowell decision, more particularly with the criterion of whether there's a significant degree of permanence here, the gravamen of their complaint is, you took this child, our grandchild, away from us. That happens as a consequence, not really taking away, but they're not awarded a placement of the child in November of 2015. That's a discrete injury under the criterion that this court has established. So the clock begins to run at that point. I mean, otherwise we'd have a situation, here's an example I just thought of in trying to articulate this. Suppose we have a ninth grade student, female. And she gets a D in math. Goes to complain to the math professor, or math teacher. And the math teacher says, I don't think women are appropriate to be mathematicians that you want to be. Child says, outrageous. Goes to the principal. The principal says, we have a procedure. Here it is, you can appeal that grade. The parents get involved and they say, we're not going to pursue it. Ninth grade. Twelfth grade goes on. The child doesn't make the math team. Child applies to a school, Penn State. And application is denied. Talks to the admission counselor. What happened? Well, you weren't a member of the math team. That's what you really needed to be admitted to this program. And the child then goes back and says, well, I wasn't admitted to the math team. The school did other things to discriminate against me. I want to go back to Mr. Smith, who had no involvement with me after that ninth grade, three and a half years ago. I want to sue him for not giving me the B or the A that I deserved. When I had the right to appeal, I didn't pursue that appeal. I had an injury, a discrete injury at that time. We don't do that. When you have a discrete injury, you have to bring the claim within two years. Here, the claim against Lousis and Landis, to the extent that it existed, of course, we submit that it doesn't. But to the extent that it's premised upon the adverse action that they were involved in, it clearly happened discreetly on November 5th, 2015, and no action was brought within two years. I'm out of time. Is there any significance, Mr. Kunkel, to the fact that you used the example of someone named Thea with a D in math? When my name is Theodore, I never quite got a D in math, although I tried very hard to get a D. Your Honor, I don't think I gave the child my hypothetical name. I thought you said it was Thea. No. Maybe I said theoretically and there was a glitch or something. I didn't give the child a name. And if I gave the child a name, it would be Gregory. Or perhaps Lumiere. I'm sorry. Be our guest. Now it's time to sit. You've done that on the show. You say your research is impeccable. Sorry, I didn't mean to walk away. No, it's all good. Please have a seat. Be our guest. Have a seat. No song on rebuttal. Pardon? No song on rebuttal. Why don't you start with the statute of limitations? Yeah, I'd like to hear that too, Mr. Boyle. Our position would be that in local parentis is a status. It's not the loss of custody that creates the loss of the in local parentis status. It's the termination of the in local parentis status when the child is adopted. So the discrete injury is not the removal or the placement of the child. The discrete injury is the termination of the parental rights. Which happened when? Which I can't remember the date. I could get the court. It was within the two years. It's within the two years, certainly. Well, actually, I want to I want to hear the dates. You're saying the time began at termination. That's when the clock began for statute of limitations. Correct, Your Honor. Who terminated the termination? I'm sorry. Who terminated those rights? Those rights were never formally terminated by any court. But the adoption of the child certainly indicated that there were no other rights involved at that point in time. Who's responsible for that? Who's responsible for the judge of the court of common place? A court terminated the rights. That's correct. Your Honor. Not the individual defendants. Correct. Your Honor. You're talking about the rights with DL now or SPL or both? SPL is what I was talking about specifically. DL would clearly have been in the statute of limitations. First of all, DL is not subject to that statute of limitations argument because those particular individuals were not involved in DL's case. And as you said, DL is a very different situation in terms of DL. Correct. DL is more of a guardianship situation. It was the mother's desire that the grandparents have DL. So it's a different situation entirely. Right. So your date is not the date that your client's adoption petition was dismissed, but rather the date that SPL was adopted by his foster parents. I believe so, Your Honor. All right. So that's September 21 of 17. Correct. You filed in, I think, August of 18. Correct, Your Honor. So that's why you say you're with it. Okay. Yes. There's a lot more I'd like to say. I have 19 seconds. I'll defer to the court if the court has any further questions. Otherwise, I would just briefly note that the order from the Court of Common Pleas said have in local parental status. That would not have been necessary if the court were acting under the third section of the statute that gives grandparents separate rights. The other thing that we would indicate is that parade of horrors that Judge McKee focused upon. We believe doing the evidence in a light that's favorable to us indicates that all of those occurred. We also would indicate that that termination letter was pretextual in that there had been multiple emails exchanged within the agency prior to that, indicating that Pickles were not going to get the child no matter what. And if we would amend that for that because of the summary judgment issue and issues of fact, and Mr. Hasselbarth makes the point that all of those, each horrible within that parade was admitted to. So how does that get us to an issue of fact? We would suggest that we would indicate that they were not admitted to. We think that when the red deposition is read closely, the witness didn't know a lot of those facts and was simply agreeing with what the agency said. Certainly the objective facts that were presented, the testimony of other evidence, and the documentary evidence that was presented all show that those were false. Right. There's some documentary evidence in terms of the liens and things like that. And, you know, that's true. Any further, Judge McKee? No, no. As I said, it's a really tragic case. These cases always are really unfortunate. It's an overworked word, but clearly unfortunate and a real tragedy here. Lives are broken in many ways that hopefully can be amended again. But I have nothing further. All right. Thank you very much. Thank you, counsel, for spirited arguments. We appreciate it. And have a good day.